*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
TANG, LAWRENCE, and STEPHENS,
Appellate Military Judges

———————————

**UNITED STATES**
Appellee

**v.**

**Anthony L. JORDAN**
Lance Corporal (E-3), U.S. Marine Corps
Appellant

**No. 201800197**

Decided: 17 January 2020.

Appeal from the United States Navy-Marine Corps Trial Judiciary, Military Judges: Lieutenant Colonel Jeffrey Munoz, USMC (arraignment); Major B.W. Barnett, USMC (motion); and Lieutenant Colonel Mark D. Sameit, USMC (trial). Sentence adjudged 4 April 2018 by a general court-martial convened at Marine Corps Base Camp Pendleton, California, consisting of members with enlisted representation. Sentence approved by the convening authority: reduction to pay-grade E-1, confinement for seven years, and a dishonorable discharge.

For Appellant: Zaven T. Saroyan, Esq.; and Lieutenant Gregory Hargis, JAGC, USN.

For Appellee: Lieutenant Commander Timothy C. Ceder, JAGC, USN; and Lieutenant Kimberly Rios, JAGC, USN.

Judge STEPHENS delivered the opinion of the Court, in which Senior Judge TANG joined. Judge LAWRENCE filed a separate opinion, concurring and dissenting in part.

———————————

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under NMCCA
Rule of Appellate Procedure 30.2.**

———————————————

STEPHENS, Judge:

Appellant entered mixed pleas. He pleaded guilty to one specification of violating Article 91, Uniform Code of Military Justice (UCMJ)[1] for disobeying the order of a non-commissioned officer, and two specifications of aggravated assault in violation of Article 128, UCMJ.[2] He pleaded not guilty to two specifications of rape and one specification of aggravated assault, in violation of Articles 120 and 128, UCMJ.[3] A general court-martial consisting of enlisted representation acquitted him of the charges and specifications to which he pleaded not guilty and then sentenced him on the remaining ones.

We have renumbered Appellant's four assignments of error: (1) the military judge abused his discretion when he denied Appellant's motion for relief under Article 13, UCMJ, due to poor brig conditions during pretrial confinement, (2) the trial counsel committed prosecutorial misconduct when he commented on the victim's unsworn statement during his sentencing argument, (3) the military judge abused his discretion when he denied Appellant's request, made after assembly of the court-martial, to be sentenced by the military judge instead of the members, and (4) the sentence imposed by the members was inappropriately severe. We find no errors in the court's findings and affirm the conviction, but find the sentence to be inappropriately severe and take corrective action in our decretal paragraph.

## I. BACKGROUND

### 1. *Lance Corporal Jordan's volatile relationship with LVS*

In 2016, then-20-year-old Lance Corporal (LCpl) Anthony L. Jordan, had a volatile romantic relationship with a 17-year-old civilian, LVS. She lived with her mother in Oceanside, California, just outside of Marine Corps Base Camp Pendleton, where LCpl Jordan was stationed. During this relationship,

---

[1] 10 U.S.C. § 891 (2016).

[2] 10 U.S.C. § 928 (2016).

[3] 10 U.S.C. §§ 920, 928 (2016).

they often argued. At least three times, LCpl Jordan became physically violent with her.

The first time, they were arguing in his barracks room, when he grabbed something that belonged to LVS and locked it in his closet. LVS became upset and broke the lock. LCpl Jordan responded by pushing her inside the closet and onto the ground, and pressed his knee on her stomach while he choked her. He kept his hands around her neck for about 15 to 20 seconds, and used a "six or seven"[4] force on a scale of ten. When LVS started to get lightheaded and stopped fighting him, he released her.

Just nine days later, there was another altercation where LCpl Jordan became physically violent with LVS. They were again in his barracks room and arguing so loudly that another Marine asked them to be quiet. This prompted LVS to leave on foot. LCpl Jordan got into his car and drove after her. He asked her to get in the car so he could drive her home. When she refused, he got out of his car, approached her from behind, and put her in a rear chokehold, using his bicep and forearm to choke her neck. He used the same amount of force for the same duration as before and stopped when LVS became compliant.

A week after the second incident, LCpl Jordan stayed at LVS's home. When he woke up to go to work, they had an argument about cell phones. He grabbed her phone and left the room. LVS then said something that upset him. He returned to the room, grabbed her arms, and pinned her down before running out of the room with the phone. Once LCpl Jordan was downstairs, he heard a loud commotion and a "big bang"[5] from LVS's bedroom, so he went back upstairs. She was crying and there was a hole in her wall. LCpl Jordan was upset and wanted to talk, but LVS did not want to. He became even more upset and placed her in another rear chokehold to "try and calm her down."[6] LCpl Jordan used about the same amount of force as the other two incidents, though this last chokehold "might have been for quite some time"[7]—possibly two or three minutes.

At some point, LVS's mother learned of the problems in the relationship and obtained a civilian restraining order. But LVS continued communicating

---

[4] Record at 146.

[5] Record at 152.

[6] *Id.*

[7] Record at 155.

with LCpl Jordan, even going as far as to create a new social media account to do so. Neither LVS nor her mother reported the assaults to military authorities.

### 2. An unrelated rape allegation against Lance Corporal Jordan

About a year later, LCpl Jordan came to the Government's attention for an unrelated alleged rape. He had started texting another young woman, LCpl STT, whom he met through a dating application. Despite never personally meeting, they immediately began sending sexually-charged text messages. She also sent him nude photographs and videos of her masturbating. She told him she was interested in "BDSM", (short for "bondage, discipline, sadism, and masochism") and also liked "rough sex."[8] They intended to meet up one evening after he had finished a field exercise.

They met in a parking lot near her barracks and she got into his car. She alleged that when she refused to kiss him, he grabbed her neck with his hand and choked her. Then he drove to another, more secluded, parking lot, and allegedly raped her in the back seat of his car by forcibly penetrating her vagina with his penis and ejaculating in her. When it was over, LCpl Jordan dropped her off at her barracks.

Within ten minutes, LCpl STT reported this to the Naval Criminal Investigative Service and she underwent a sexual assault forensic examination within the hour. LCpl Jordan's command immediately placed him on pre-trial restriction.

The next day, the Officer of the Day (OOD), a staff sergeant, verbally ordered LCpl Jordan to remain in a barracks room and told him if he needed to go anywhere, to check out with the noncommissioned officer on duty in the barracks. That same day, LCpl Jordan did check out with the barracks duty to get a haircut and something to eat. But later that evening when he went to see LCpl STT, he did not check out. When the command found out, it immediately placed him into pretrial confinement.

### 3. Lance Corporal Jordan's general court-martial

Eventually, LCpl Jordan was charged with:

> two specifications of aggravated assault for choking LVS, with the second specification covering the final two instances as "divers occasions," (Article 128, UCMJ);

---

[8] Record at 332-33, 338; 277-78.

one specification of disobeying the OOD's order, (Article 91, UCMJ);

two specifications (under different theories for contingencies of proof) for raping LCpl STT, (Article 120, UCMJ) and;

one specification of aggravated assault for choking LCpl STT (Article. 128, UCMJ).

LCpl Jordan made an apparent tactical decision to enter mixed pleas without any pretrial agreement. A few days before the start of the contested trial, he pleaded guilty to the aggravated assaults against LVS and disobeying the OOD. He did so only after his counsel moved the court in limine to confirm that evidence of the assault against LVS would not be admissible to prove the alleged offenses relating to LCpl STT. He elected not to inform the members of his guilty pleas concerning LVS, and then contested LCpl STT's allegations. He was acquitted of all of the charges involving LCpl STT and only then were the members informed of his guilty pleas in which he admitted he choked LVS in a manner similar to what LCpl STT described.

During the contested portion of the trial, the defense theory was that LCpl STT either consented to rough, BDSM-style sex, or that LCpl Jordan reasonably believed she did because their prior text message conversations covered in explicit detail their future intentions. The theory was that she regretted actually getting "what she wanted"[9] from the rough sex and rough handling by LCpl Jordan. She was also criticized for not providing the entire picture to law enforcement of the sexual nature of her "relationship" with him.

On direct examination, she described the way LCpl Jordan had allegedly choked her in his car after she declined to kiss him:

Q. And then what happened?

A. I didn't want to at first, but after that he brought up the whole "Daddy" situation again.[10] He said that I still had to call him "Daddy," and the fact that I didn't want to upset him. So that's when he grabbed my neck.

Q. When you say "he grabbed my neck," what do you mean by that?

---

[9] Record at 446, 453.

[10] As part of their "relationship," LCpl STT would call LCpl Jordan "Daddy" and he called her "Bitch." Record at 278.

A.    He grabbed my neck from the front.

Q.    What did he grab it with?

A.    His hand.

Q.    Was he doing anything else to you physically?

A.    He—I mean, he pulled me towards him.

Q.    Did he hit you at any point?

A.    Yes.

Q.    So could you walk us through the exact order of how this happened?

A.    He choked me first but—and then pulled me close and he said that I didn't kiss him right or I didn't really have—and I wasn't into it. So that's what made him hit me.

. . . .

Q.    So when he—so he—you said he's choked you at this point and he pulled you closer. What happens next?

A.    I started getting light headed. So after that I just gave in.

. . . .

Q.    And then the choking, describe exactly on your neck where he put his hands on there?

A.    His thumb was on one side and his other fingers were, like, on the other side.

TC:   So I will describe that for the record. The witness is taking her hand and she's put her hand around her throat with four fingers on one side and her thumb on the other side.

Q.    And how he did that—when he had his hand on your throat, how much force did he apply?

A.    I mean, I would say a lot. I mean, mostly because he was pushing on the sides of my neck so that—so it made it hurt even more.

> Q. And what physical effect did you feel as a result of this?
>
> A. I felt lightheaded.[11]

The Government also presented the testimony of the medical professional who conducted LCpl STT's sexual assault forensic examination. To prove an element of aggravated assault, the witness also described the potential harm from the choking.

At the time, the members did not know that LCpl Jordan had already pleaded guilty to choking LVS to the point where she displayed "lightheadedness."[12] They returned a finding of not guilty for the rape and aggravated assault against LCpl STT. But before the five members could depart, the military judge instructed them:

> Members, at this time, I'm going to send you home for the night. We are in a little bit of a unique scenario. In a prior session of court, Lance Corporal Jordan pled guilty to several specifications that were unrelated to the Specifications before the Court. And you are going to have an opportunity to hear the evidence that he pled guilty to, and then we are going to move into the sentencing phase of the trial. And you, members, are going to adjudge a sentence for the Specifications to which Lance Corporal Jordan pled guilty.[13]

The military judge then told the members to return the next morning at 0800 to "move straight into the sentencing phase."[14]

The next day, the members were instructed by the military judge. He told them they could not hold it against LCpl Jordan that they did not know about his guilty pleas. The military judge instructed the members they could not consider *any* of the evidence that was presented on the merits during the contested portion of the trial. The military judge also provided an instruction drafted by the Defense to that end and allowed the Defense to voir dire the members. No challenges were made. The members listened to LCpl Jordan's providence inquiry in court.[15] They heard, in LCpl Jordan's own words, how

---

[11] Record at 289-91.

[12] Record at 146.

[13] Record at 494.

[14] *Id.*

[15] Record at 510.

he used his hands, and arm, to execute MCMAP (Marine Corps Martial Arts Program) style moves on LVS, how much force he used, and that he did so, on at least one occasion, to where LVS displayed "lightheadedness."[16] Then LVS's mother testified for the Government and LVS presented her unsworn statement. The Defense presented LCpl Jordan's unsworn statement.

The trial counsel asked the members to sentence LCpl Jordan to the maximum punishment of confinement for seven years and a dishonorable discharge. And after less than 36 minutes of deliberation—from the time the parties went off the record, until they were all reassembled for the members to announce their sentence—they did just that.[17]

Additional facts are discussed below as necessary.

## II. DISCUSSION

### A. Brig Conditions Amounting to a Violation of Article 13, UCMJ

The day after sentencing, the military judge held an Article 39(a), UCMJ, session to address the Defense request for additional pretrial credit under Article 13, UCMJ. The Defense alleged the pretrial conditions for LCpl Jordan at the Marine Corps Base Camp Pendleton Brig were filthy and more rigorous than necessary to assure his presence at trial. After hearing evidence and personally visiting the brig, the military judge denied the motion in a six-page written ruling.[18]

The crux of LCpl Jordan's motion was that (1) the showers had an infestation of worms that were growing in the walls, (2) the toilets would back up and cause toilets and sinks to backflow, and (3) an unpleasant smell and discoloration came from water dripping from the ceiling above a fire alarm. Another detainee had filed a complaint in December 2017—at about the midpoint of LCpl Jordan's eight months of pretrial confinement—concerning the toilet backflow and the fire alarm problem. Over the following month, six more similar complaints were filed. In early February 2018, LCpl Jordan filed his only complaint about the fire alarm, but did not mention any problems with the toilets or the showers. About a week after LCpl Jordan's complaint, plumbers scoped and cleared the sewage pipes.

---

[16] Record at 146.

[17] Record at 542-43. The members departed to deliberate at 1207 on 3 April 2018. The court-martial opened at 1243.

[18] Appellate Exhibit LXXI.

The day of the post-trial Article 39(a) session, the military judge and counsel for both parties inspected the brig. In his Findings of Fact, the military judge wrote: "Overall, the squad-bay 1 bathroom was cleaner and better smelling than many of the bathrooms throughout the Marine Corps, including the courtroom bathrooms at Camp Pendleton."[19]

When a military judge denies credit under Article 13, UCMJ, it is a mixed question of law and fact.[20] We review a military judge's factual findings on this matter for clear error[21] and we review the application of those facts to the law, and the ultimate issue of whether confinement credit should have been awarded de novo.[22]

Article 13's two prongs prohibit an intention to impose pretrial punishment and to impose conditions that are more rigorous than necessary to ensure an accused's presence at trial. "Conditions that are sufficiently egregious may give rise to a permissive inference that an accused is being punished, or the conditions may be so excessive as to constitute punishment."[23] Because LCpl Jordan conceded the Government had no intent to punish, we focus on the conditions.

We see nothing in the record indicating the military judge made clear errors in his findings of fact. The complaints made by LCpl Jordan and others show the brig conditions appear to be the sort of routine maintenance and plumbing issues found in many Marine Corps buildings. While perhaps not the gold-standard for facilities maintenance, the relevant point is whether these conditions amounted to the sort of squalid conditions that went beyond what was necessary to simply guarantee LCpl Jordan's presence at trial. They did not.

In *United States v. Harris*,[24] our superior court declined to grant additional credit beyond what our court had already awarded when appellant was

---

[19] *Id*. at 4.

[20] *United States v. Mosby*, 56 M.J. 309, 310 (C.A.A.F. 2002) (citing *United States v. Smith*, 53 M.J. 168, 170 (C.A.A.F. 2000).

[21] *Id*.

[22] *United States v. King*, 61 M.J. 225, 227 (C.A.A.F. 2005) (citing *Mosby*, 56 M.J. at 310).

[23] *United States v. Harris*, 66 M.J. 166, 168 (C.A.A.F. 2008) (citations omitted) (internal quotation marks omitted).

[24] *Id*.

"forced to remain in his cell twenty-one hours each day, wear shackles during his two-hour television break, eat his meals in his cell, endure roaches and mice in his cell, and endure 'dire heat' due to a lack of air conditioning."[25] Though we awarded that appellant credit for being placed in maximum custody, and its attendant conditions, our superior court found he did not carry his burden under Article 13 to demonstrate an entitlement to any additional relief. As LCpl Jordan's conditions were not nearly as rigorous as the ones in *Harris*, we find he has also not carried his burden. We find no error in either the military judge's findings of fact, or his application of those facts to the law.

## B. Prosecutorial Misconduct

During arguments on sentencing, the trial counsel commented on the contents of LVS's unsworn statement. The Defense did not object. Now, Appellant argues this comment constituted prosecutorial misconduct because a victim's unsworn statement is "not evidence" and prosecutors may not comment on matters that are "not evidence." We recently issued an opinion covering this exact issue in *United States v. Barclay*.[26] We reach the same conclusion that a trial counsel—or a defense counsel—may comment on a victim's unsworn statement, just as either party may comment on an accused's unsworn statement.[27] We find no "plain error"[28] that the trial counsel "overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense."[29]

## C. Motion for Sentencing by Military Judge Alone

Leading up to the trial, LCpl Jordan elected to plead guilty to the charges and specifications concerning LVS and disobeying the OOD. With the remaining charges and specifications concerning LCpl STT, he pleaded not guilty and elected to be tried by members with enlisted representation. The military judge clearly explained to LCpl Jordan that his pleas of guilty would be heard by the military judge, but then his sentence would ultimately be determined

---

[25] *Id.* at 168-69.

[26] No. 201800271, unpublished op. (N-M Ct. Crim. App. 29 Oct 2019).

[27] *See United States v. Barrier*, 61 M.J. 482, 484 (C.A.A.F. 2005).

[28] *United States v. Powell*, 49 M.J. 460, 463-65 (C.A.A.F. 1998).

[29] *United States v. Hornback*, 73 M.J. 155, 159 (C.A.A.F. 2014) (quoting *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005)) (internal quotations omitted).

by the members. After the members were assembled, but before they returned findings, LCpl Jordan requested to be sentenced by military judge alone if the members returned not guilty findings to the charges and specifications involving LCpl STT. The military judge denied the motion and we review that decision for an abuse of discretion.[30]

Under Article 16, UCMJ,[31] a general court-martial may consist of a military judge sitting alone. An accused, with knowledge of the identity of the military judge and the benefit of consultation with defense counsel, may make such a request orally or in writing *before the court is assembled*. Because this request is not "jurisdictional in nature," the military judge may approve an untimely request for trial by military judge alone "if justified by the circumstances."[32]

In *United States v. Jungbluth*,[33] we held that the circumstances warranted the military judge's acceptance of a request for sentencing by military judge alone after the assembly of the court and introduction of evidence on the merits.[34] In that case, after the appellant had elected trial by members, the trial counsel became ill and fainted in court, causing a delay in the proceedings. During the interim, the appellant and the convening authority agreed to terms, which included the appellant pleading guilty and being sentenced by a military judge. Because both the government and the appellant would receive some benefit of that bargain, the circumstances warranted the military judge's acceptance of the request for a judge-alone forum.

This Court stated in *Jungbluth* that there is "far greater need for authority on the part of the judge to approve or disapprove a request for trial by him alone as to a request submitted *after* assembly of the court than there is as to

---

[30] *United States v. Wright*, 5 M.J. 106, 107 (C.M.A. 1987).

[31] 10 U.S.C. § 816 (2016).

[32] *United States v. Jungbluth*, 48 M.J. 953, 956 (N-M. Ct. Crim. App. 1998) (quoting *United States v. Morris*, 49 C.M.R. 653, 659 (C.M.A. 1975)) (internal quotation marks omitted).

[33] *Id.*

[34] *See* RULE FOR COURTS-MARTIAL (R.C.M.) 903(e), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.). This Rule allows for a military judge, "until the beginning of the introduction of evidence on the merits" to consider an untimely request for trial by military judge alone or withdrawal of such a request. The Rule is silent on whether a military judge may consider such a request after assembly of members. *See*, *Jungbluth*, 48 M.J. at 957.

a request submitted before trial."[35] This is because, once the court is assembled, the Government bears the cost of the members serving, and having served, as members rather than attending to their normal military duties. Such a post-assembly request provides a possible windfall to an accused. He gets the benefit, as he sees it, of having a military judge decide his case for findings or sentence, but the Government has already forfeited its benefit because it removed the members from their normal military duties for the proceeding. The Government cannot un-ring the bell. For a military judge to grant such a post-assembly request, there must be some matter of fundamental fairness at play. A mere tactical advantage cannot be enough. We find no abuse of discretion by the military judge.

We do not consider the members' ultimate sentence in determining whether the military judge abused his discretion at the time he denied Appellant's request. When courts review probable cause determinations, for instance, they "must look at the information made known to the authorizing official at the time of his decision."[36] In a similar manner, at the time of the military judge's decision, he could not have known that the eventual members' sentence would be inappropriately severe or give indicia that they may have disregarded his instructions. Not only did the military judge make the correct decision based on the *Jungbluth* precedent, he took extra precautions that were requested by the Defense.

We note this case took place prior to the 1 January 2019 effective date of the 2016 Military Justice Act,[37] which included updates to Articles 53[38] and 25[39] of the UCMJ. This trial also took place before the President promulgated the updated RULE FOR COURT-MARTIAL (R.C.M.) 1002(b) contained in the 2019 edition of the MANUAL FOR COURTS-MARTIAL.[40] The updates to these UCMJ Articles and this Rule make sentencing by the military judge the

---

[35] *Jungbluth*, 48 M.J. at 956 (quoting *Morris*, 49 C.M.R. at 658) (internal quotations omitted) (emphasis added).

[36] *United States v. Bethea*, 61 M.J. 184, 187 (C.A.A.F. 2005) (quoting *United States v. Carter*, 54 M.J. 414, 418 (C.A.A.F. 2001)) (internal quotation marks omitted) (internal citation omitted)).

[37] Military Justice Act of 2016, Division E of the National Defense Authorization for Fiscal Year 2017, Pub. L. No. 114-308, 130 Stat. 2000 (2016).

[38] 10 U.S.C. § 853(b)(1)(A), (B) (2019).

[39] 10 U.S.C. § 825 (2019).

[40] RULE FOR COURT-MARTIAL 1002(b) (2019).

default forum in non-capital cases consisting of members. The new R.C.M. makes it mandatory for the military judge to inquire on the record of an accused's desire for sentencing forum. This sea-change in the law and procedure for sentencing further indicates the military judge in this case, before this sea-change, had significant discretion over the matter and did not abuse it.

## D. Sentence Appropriateness

### 1. Standard of review and the law

Article 66, UCMJ, mandates we may "affirm only such findings of guilty and the sentence or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved."[41] Although Congress has amended the UCMJ several times since its original enactment in 1950, this mandate in Article 66 has remained virtually unchanged.[42] In 1957, in *Jackson v. Taylor,* the Supreme Court recognized and affirmed the broad powers of service courts of criminal appeals—then boards of review—to "affirm . . . such part or amount of the sentence, as it finds correct . . . [.]"[43] Recognizing that "[r]eviewing authorities have broad powers under military law," the Court held that the board of review could properly approve a 20 year sentence of confinement for rape after setting aside the appellant's conviction for murder, for which offenses he originally received a sentence of confinement for life.[44] The Court quoted the Congressional testimony of the chairman of the drafting committee for the original 1950 UCMJ, Professor Edmund M. Morgan, Jr., to hold that Congress intended the board of review to have the "power to alter sentences."[45] This power was not limited to the ability to reassess a sentence after setting

---

[41] Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1) (2019).

[42] Although pertinent to three-officer or three-civilian service boards of review, the original Article 66(c), UCMJ, required that the board of review could "affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." The Act of 5 May 1950, Public Law 506, 81st Congress, c. 169, 1 1, 64 Stat. 108; Title 50 U. S. C. (Chap. 22) §§ 551-736.

[43] 353 U.S. 569, 573 (1957).

[44] *Id.* at 574.

[45] *Id.* at 577.

aside a finding; this power included the de novo ability to review the propriety of an adjudged sentence and alter it if justice so demands.[46]

Our superior court has referred to this power as "a sweeping Congressional mandate to ensure 'a fair and just punishment for every accused.'"[47] With these parameters in mind, we review the appropriateness of a sentence de novo.[48] "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves."[49] This requires this Court to give "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and character of the offender."[50] We recognize that members are free to impose any sentence they consider fair and just within the limits set by the Code or the President,[51] just as we recognize that this Court may not engage in acts of clemency.[52] Considering, as we must, the entire record and determining a just sentence for this offender and his offenses, we do not ourselves believe the sentence is "correct in law and fact based on the entirety of the record,"[53] and we decline to approve the sentence as adjudged.

### 2. De novo review for sentence appropriateness

We do not lightly discount the sentence the members awarded. We need not speculate how the members arrived at the sentence they imposed. Nor

---

[46] The Court quoted Professor Morgan, who testified before the Senate Armed Services Committee that a board of review "may review law, facts, and practically, sentences; because the provisions stipulate that the board of review shall affirm only so much of the sentence as it finds to be justified by the whole record. It gives the board of review . . . the power to review facts, law and sentence . . . [.]" *Id.* at 576 (citation omitted).

[47] *United States v. Baier*, 60 M.J. 382, 384 (C.A.A.F. 2005) (quoting *United States v. Bauerbach*, 55 M.J. 501, 504 (A.Ct. Crim. App. 2001)).

[48] *See Id.*

[49] *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988).

[50] *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180-81 (C.M.A. 1959)).

[51] *United States v. Dedert*, 54 M.J. 904, 909 (N-M. Ct. Crim. App. 2001).

[52] *See United States v. Nerad*, 69 M.J. 138, 145 (C.A.A.F. 2010) (suggesting that modification of a sentence on grounds such as equity is a function of *command* prerogative).

[53] Art. 66(c), UCMJ.

must we decide whether the members failed to follow the military judge's instructions to completely disregard all the evidence presented during the contested trial, or the instruction not to hold it against LCpl Jordan that he did not disclose his guilty pleas. This is irrelevant to this Court's analysis on the issue of sentence appropriateness. From the record, it is remarkable that LCpl STT used the term "lightheaded" in her testimony to describe the feeling she got when LCpl Jordan allegedly choked her and that this was the same word used by LCpl Jordan in his providence inquiry when he choked LVS. Again, it is certainly possible the members were upset that LCpl Jordan "hid" the information concerning LVS as they considered LCpl STT's testimony. But that is irrelevant and we need not speculate on what the members did or did not do. It is within our purview to approve only such portion of the sentence as we believe should be approved. Based on the evidence properly admitted for the purposes of sentencing LCpl Jordan on the offenses for which he was convicted, the record does not justify the maximum sentence the members awarded.

"A dishonorable discharge should be reserved for those who, in the opinion of the Court, should be separated under conditions of dishonor after a conviction of serious offenses of civil or military nature warranting such severe punishment."[54] LCpl Jordan deserves a dishonorable discharge as well as the adjudged reduction to pay-grade E-1. We are then left with determining a just sentence of confinement between the permissible sentences of no confinement and the maximum term of seven years. In order to balance "the nature and seriousness of the offense and the character of the offender"[55] we review both the Government's case in aggravation and LCpl Jordan's matters in mitigation.

We first review the Government's case in aggravation. The Government played the military judge's providency colloquy with LCpl Jordan. The members heard him describe his own acts against LVS. LVS's mother, who had strong family ties to the Marine Corps and even worked on base, testified that she personally felt as if she had failed her daughter. She also described how LVS had changes to her eating and sleeping habits and experienced episodes of panic when someone would surprise her. She also admitted that she was not surprised to learn that LVS continued contacting LCpl Jordan after the civilian restraining order was issued. The Government published

---

[54] Record at 538. *See also* RULE FOR COURTS-MARTIAL 1003(a)(8)(B) MANUAL FOR COURTS-MARTIAL, UNITED STATES (2019 ed.).

[55] *Snelling*, 14 M.J. at 268 (quoting *Mamaluy*, 27 C.M.R. at 180-81.).

LCpl Jordan's military records that included a prior nonjudicial punishment and several counselings. Outside of the providence inquiry, the Government presented no additional evidence concerning LCpl Jordan's violation of the OOD's order and later only briefly mentioned it in its sentencing argument.

After the Government case in aggravation closed, LVS presented her unsworn statement pursuant to R.C.M. 1001A. She described her feelings of anxiety, depression, and embarrassment. She stated that she regretted disregarding her mother's advice concerning the relationship. She said that she had loved LCpl Jordan but that he made the relationship one-sided—he had a bad temper and was "controlling."[56]

The Defense case presented LCpl Jordan's unsworn statement along with his high school diploma, his Professional Military Education certificates, and his military records. In his unsworn statement, LCpl Jordan apologized to both LVS and her mother, saying that he "acted off emotional impulse versus using common sense."[57] He also stated that he cared about LVS and wished the best for her.

The Government did not present any evidence LVS lost consciousness, suffered either immediate or lasting physical injuries, or required medical treatment. Although LVS described the long-term emotional impact she suffered, she was not so harmed that she completely broke off all contact with LCpl Jordan. Even ten months after the last assault, she was in contact with him—even keeping her contact hidden from her mother after the civilian restraining order was issued. While there was no excuse for LCpl Jordan's repeated use of physical violence against LVS, her actions shortly after the assaults are a factor for us to consider in determining an appropriate sentence.

In considering the entire record, we decline to affirm the sentence adjudged. While not minimizing in any way the emotional trauma suffered by LVS, LCpl Jordan's misconduct does not rise to the level of the maximum punishment.

Finally, we note that the sentence did not appear to take into account the mitigating factor that LCpl Jordan pleaded guilty or afford him the benefit of any evidence he presented in mitigation. We are not saying that a maximum punishment cannot be awarded for an accused who pleads guilty, but rather

---

[56] Record at 519.

[57] Record at 525.

just recognizing that the maximum sentence of confinement was inappropriate in this case.

We believe a sentence of 36 months of confinement, a dishonorable discharge, and a reduction to pay-grade E-1 is a just sentence that is merited by the evidence.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined the approved findings of guilt are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred. Arts. 59, 66, UCMJ. With respect to the sentence, only the portion of the approved sentence that extends to reduction to pay-grade E-1, confinement for 36 months, and a dishonorable discharge is affirmed.

Senior Judge TANG concurs.

LAWRENCE, Judge (concurring and dissenting in part):

I join my colleagues, concurring in parts I and II.A., II.B., II.C. and II.D.1. of the opinion. In part II.D.2., I additionally concur with the majority opinion's discussion of the appropriateness of a sentence that includes reduction to E-1 and a dishonorable discharge. However, while I too find the maximum allowable sentence to confinement adjudged by the members panel to be excessive, I dissent from my colleagues concerning the term of confinement necessary to balance "the nature and seriousness of the offense[s] and the character of the offender."[1]

Lance Corporal Jordan, a physically fit Marine with martial arts training, misused that training on multiple occasions, violently attacking the teenage[2] civilian woman he was dating, LVS. For these aggravated assaults and his orders violation, I believe that an appropriate sentence would include reduction to paygrade E-1, confinement for 49 months, and a dishonorable discharge.

In a verbal argument on 20 August 2016 while in his barracks room aboard Marine Corps Base Camp Pendleton, LCpl Jordan seized a personal item of LVS and locked it inside a closet door. When she tried to retrieve it and the lock broke, LCpl Jordan "pushed her inside of the closet and onto the ground and put [his] knee onto her stomach and with [his] hands [he] squeezed around her neck . . ."[3] such that his thumbs touched around LVS's trachea. He admitted that he was not provoked or acting in self-defense and that he used a means and force likely to cause her grievous bodily harm as "[i]t could have potentially killed her"[4] He used "quite a bit" of force in squeezing around her neck. Using a scale from 1 to 10 with 10 being "all the force [he could] muster," LCpl Jordan estimated he applied a 6 or 7-level force to LVS's neck in strangling her with his hands.[5] Looking right at her with his knee on her stomach and hands squeezing around her throat, he saw she was

---

[1] *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180-81 (C.M.A.1959)).

[2] We know that LVS was 17-years-old when she and LCpl Jordan began their relationship, but her age at the time of his attacks is unknown.

[3] Record at 145.

[4] *Id*. at 146.

[5] *Id*.

beginning to lose consciousness as he continued to strangle her for "15 to 20 seconds," only stopping when LVS stopped struggling and appeared on the verge of losing consciousness.[6] In his colloquy with the military judge, LCpl Jordan recognized that there were sensitive parts in one's neck that were susceptible to injury if constricted in the wrong way and that, through his Marine Corps martial arts training, serious brain injury could quickly result from the interruption of oxygen to the brain by the force he applied to LVS's neck.

Just over a week later, a verbal disagreement between the two preceded LCpl Jordan's violent physical outburst. Here, LVS left LCpl Jordan's barracks room and LCpl Jordan pursued her in his car. When LVS declined to get in LCpl Jordan's car, he "placed [his] forearm of [his] bicep[s] around her neck and was trying to get her into the car,"[7] again using a force he estimated as a "seven or six"[8] out of ten as he squeezed around her neck for "[a]round 15 seconds."[9] LCpl Jordan acknowledged he applied his Marine Corps martial arts training, using the "rear naked choke" on LVS where his arm was around her neck with her trachea in the small or pit of his elbow, squeezing her neck by both his biceps and forearm with his other arm positioned behind her neck to control it and leverage pressure forward.[10] LCpl Jordan knew that the means and force he used could have potentially killed LVS. Because he was behind her during this violent attack, he did not have the opportunity to see her face, but he described that she "became compliant."[11] He acknowledged knowing that this technique was more effective in cutting off blood to the brain and causing loss of consciousness in mere seconds while also carry-

---

[6] *Id.*

[7] *Id.* at 148.

[8] *Id.* at 149.

[9] *Id.* at 150.

[10] The "rear naked choke" is a "blood choke" where constriction of the carotid artery of an enemy reduces oxygen to the brain, resulting in unconsciousness in as little as 8 to 13 seconds. *See* Cpl Jess Levens, "San Diego Recruits Learn Choking Techniques (2005), https://www.mcrc.marines.mil/News/News-Article-Display/Article/519502/san-diego-recruits-learn-choking-techniques/ (last visited 9 January 2020). As stressed in training, such techniques are dangerous and sudden jerking movements or excessive pressure may collapse the trachea. Training personnel maintain close supervision, the "tap-out" rule always applies and no holds will exceed five seconds.

[11] Record at 151.

ing the risk of quickly injuring the brain. This is how LCpl Jordan responded to LVS's mere verbal refusal to get into his car.

Within about a week, LCpl Jordan again assaulted LVS, this time at her house. Upset with something she said to him, LCpl Jordan explained how he "turned around, and placed both of [his] hands onto both of her arms and pushed her back into the room and pinned her down, and she started to resist."[12] Shortly after leaving the room and going down the steps, LCpl Jordan returned to LVS crying. When LVS refused to talk with LCpl Jordan, he got upset "[a]nd that's when [he] again placed [his] forearm and [his] bicep[s] around her neck to try and calm her down."[13] While LCpl Jordan said he did not clearly remember the duration or severity of this chokehold, he said he had viewed LVS's statement to special agents of the Naval Criminal Investigative Service and had no reason to believe that she had lied about what happened in this violent episode. Asked what he personally believed happened after reviewing all the evidence, LCpl Jordan said that he "believe[d] that [he] did choke her and it might have been for quite some time . . . . [r]oughly *two to three minutes*."[14] In again applying the same rear naked chokehold as in the earlier of these divers occasions in this specification, LCpl Jordan went on to describe that he "believe[d] that [he] choked her, more so at first, in a way to try to control and restrain her. But during that time that [he] did flex [his] bicep[s] and begin to apply a serious amount of pressure before releasing it, and then reapplying it again."[15] He said this was not a constant pressure, but he used a significant amount of force, similar to the 6 or 7 out of 10 that he used in his earlier chokehold attack. He acknowledged that he had been trained on these chokeholds and he believed he was doing them properly.

There is little truly favorable information that LCpl Jordan offered in mitigation; some of his avoidance frankly exacerbates his situation. In his brief unsworn statement, he repeatedly emphasized that his offenses against LVS took place two years prior.[16] While saying that he was sorry and took respon-

---

[12] Record at 152.

[13] *Id.*

[14] *Id.* at 155 (emphasis added).

[15] *Id.* at 157.

[16] "Two years ago, I dated L.V.S. And two years ago, I put my hands on her." Record at 524. "Two years ago, I acted off emotional impulse . . . ." *Id.* at 525. "[T]hese actions two years ago, in a two month span, do[ ] not define me as a man nor a Marine." *Id.*

sibility for his actions and despite LVS just having personally presented a compelling unsworn victim impact statement, he went on to say that he realized after the end of the relationship that "*our*" relationship was toxic and they were "physical and angry *with each other*" and that "*we* acted like kids."[17] Aside from his attempt to minimize and share responsibility for *his* violence, he presented his military records, Professional Military Education certificates, and high school diploma. That he pleaded guilty to these offenses shortly before trial spared the Government little in resources as they had already prepared for a contested trial and seemingly had LVS as someone who was willing to appear and may well have been a compelling witness.

The majority opinion offers that "[t]he Government did not present any evidence LVS lost consciousness, suffered either immediate or lasting physical injuries, or required medical treatment."[18] The law requires no such documented physical injury from a victim in order to merit a sufficiently serious sentence for these most serious offenses. Likewise, the majority says they "do not minimiz[e] in any way the emotional trauma suffered by LVS,"[19] but they proceed to marginalize this girl's account as somehow overblown for not making an immediate and clean break from her "controlling"[20] and violent boyfriend. In her unsworn victim impact statement, LVS explained that she stayed in a turbulent relationship with LCpl Jordan despite his repeated physical abuse "because [she] loved him, because [she] thought things could get better. [She] thought, how he was in the beginning is what . . . . he would come back to."[21] While I agree that her actions are a *factor* to consider, I believe they need to be put in the appropriate context: this was a teenage girl who was in a relationship with a controlling and emotionally and physically abusive Marine who misused his training by violently attacking her on multiple occasions.

Finally, while the majority opinion laments that "the Government presented no additional evidence concerning LCpl Jordan's violation of the OOD's order and later only briefly mentioned it in its sentencing argument,"[22] there is little doubt that this offense itself deserves some considera-

---

[17] *Id.* at 524 (emphasis added).

[18] Majority Opinion at *16.

[19] *Id.*

[20] Record at 519.

[21] *Id.* at 520.

[22] Majority Opinion at *15.

tion in his sentence to confinement. The Government surely recognized it had enough information before the members to merit an appropriate sentence without unduly highlighting a serious, but less significant, offense compared to Appellant's violent assaults upon LVS. I agree that the members returning a sentence to include the maximum punishment of confinement for one year for this offense is not appropriate, but due weight should be given to this offense and itself reflected in the unitary sentence.

For the foregoing reasons, I concur and dissent in part.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court